FORD *v.* COBB *et al.*

Whether an agreement, or the relation between the parties, shall preserve the character of personalty in things so affixed to the freehold, as that but for such agreement or relation they would become a part of the realty, depends upon their essential character, and the mode in which they are annexed, *e. g.*, whether they can be removed without serious damage to the freehold, or substantially destroying their own qualities, and value.

Salt kettles were bought and mortgaged to the seller as personalty. They were imbedded in brick arches, but could be removed without injury to them, by displacing a portion of the brick at inconsiderable expense, and the course of the manufacture required them to be thus removed and be re-set annually: *Held*, that they continued personalty as against a subsequent purchaser of the salt works, who had no notice of the facts, other than constructively from the filing of the chattel mortgage.

APPEAL from the Supreme Court. Action to recover damages for an alleged illegal entry upon the plaintiff's premises, and taking, removing and converting twenty-three salt kettles. On the trial before a referee, it appeared that on the 6th September, 1855, one Orrin W. Titus was in possession of a lot of land, known as block No. 55, in the village of Liverpool, Onondaga county, upon which he had erected works for the manufacture of salt. On that day he purchased of the defendants fifty iron salt kettles, and certain iron arch pieces, arch fronts and grates, to be put up in said salt works, for the price of $955.60, for which he gave his promissory notes, payable in November, July and August next after the purchase. He also executed to the defendants a chattel mortgage upon said articles, which recited the sale and that the kettles, &c., were about to be taken from Syracuse to Liverpool, and to be set up in the aforesaid salt block. It was conditioned to be void if Titus should pay the notes at their maturity; otherwise to be an absolute transfer to the defendants. Titus was to remain in possession until default, unless the defendants should consider themselves insecure; in which case they had a right to

Ford *v*. Cobb.

take possession of the property and apply it to the payment of the debt, and Titus was to pay the deficiency if any. The mortgage was duly filed in the clerk's office of Onondaga county, and was continued in force by re-filing according to the statute. Titus thereupon set the kettles in arches, upon the salt block, in such manner that they could not be removed, except by tearing off a portion of the upper bricks of the arch, and prying the kettles out by a plank and bars. It was proved to be the general custom to take the kettles from the arch, and to re-set them every season before commencing boiling in the spring; and that these kettles had been taken out, re-set in the fall of 1856, before the defendants took them, as afterwards mentioned; and that it would have been necessary again to take them out, and re-set them the ensuing fall, if the defendants had not taken them.

Titus was the beneficial owner of the lots on which the salt works were erected, in June, 1855, though the legal title was in Horace White, from whom he had an executory contract. He, Titus, had put up the frame of the salt works, and had covered the building; and sometime in that month he made a verbal agreement with the plaintiff, to sell him an undivided half of this property, and of other real estate, for $2,000, nearly all of which was paid down. By this agreement, Titus was to put in the kettles, half the cost of which was included in the purchase price, finish the salt block and wall it; and this he accordingly did by purchasing and putting in the kettles and otherwise; and he leased the whole to one Soule, who continued to run the salt works down to the time the defendants took the kettles. In October, 1855, Titus procured White, in whom the legal title was, to convey the lot to one T. O. Titus, and the latter, on the 21st March, 1856, by O. W. Titus' procurement, conveyed the same to O. W. Titus and the plaintiff, and in November, 1856, O. W. Titus conveyed his interest to the plaintiff.

On the 10th February, 1857, no part of the notes given for the purchase price of the kettles, except the first note for $200, having been paid, the defendants entered upon the premises,

and took and carried away twenty-three of the salt kettles; claiming them by virtue of the mortgage. They did no more damage than was necessary, but they were obliged to remove a part of the upper bricks of the arch, and to pry up the kettles, each of which weighed about 675 pounds, in the manner before mentioned; by which, as the referee found, the property was injured to the amount of $50. The plaintiff was absent from the country, and did not know of the purchase of the kettles when it was made, or of the giving of the chattel mortgage, until the day the kettles were taken by the defendants. The referee held, as matter of law, that the kettles were a part of the realty, and that the plaintiff became the owner of them by his purchase of the land, and he awarded damages to $461.77, for which judgment was entered; and it was affirmed at general term. The defendants appealed. The case was submitted upon printed briefs.

*Philo Gridley*, for the appellants.

*James Noxon*, for the respondent.

DENIO, J. The case is to be considered as though O. W. Titus was the owner of the land at the time he purchased the kettles and put them into the arch, and as though the plaintiff subsequently purchased the land from him, and took a conveyance of it without any notice of the defendants' claim to the kettles. This is the precise point of view in which the question has been regarded in the Supreme Court, and in the briefs which have been submitted by the counsel for the respective parties. The plaintiff, it is true, had made a verbal agreement with Titus, anterior to the time when the kettles were set, but the latter was in possession of the land as owner, with the plaintiff's consent, when he purchased and mortgaged the kettles; and it does not appear that the defendants had any knowledge of the verbal arrangement between Titus and the plaintiff.

I shall assume, that if Titus had paid for the kettles when he purchased them, instead of mortgaging them for the purchase

price, the manner in which he annexed them to the freehold was such as would have converted them into a parcel of the realty; and that they would have passed to his subsequent grantee of the land, or would have gone to his heirs or devisees if he had died without conveying it. It is very clear that this would have been so at the common law and independently of the provisions of the Revised Statutes. The case of the salt pans, decided by Lord MANSFIELD, where it was held that fixtures, very similar in their purpose and mode of annexation with these now in question, belonged to the heirs and not to the executors, has been very generally followed in England and in this country. (*Lawton* v. *Salmon*, 1 *H. Bl.*, 258, *note; and see Murdock* v. *Gifford*, 18 *N. Y.*, 28, *and cases cited.*) There is room for an argument, that the rule thus established has been modified by the provision of the Revised Statutes, which declares that "things annexed to the freehold or to any building for the purpose of trade or manufacture, and not fixed into the wall of a house so as to be essential to its support," shall go to the executor or administrator to be applied as part of the personal property. (2 *R. S.*, 82, § 6, *subd.* 4.) Apparently it was the intention of the Legislature to abolish the distinction, which had become well established, between the rights of a tenant to remove certain kinds of fixtures which he had himself annexed to the freehold of the demised premises, and those of the heirs or devisee. If that is the true construction of this provision, the kettles in question ought to be held to be personal property, and the plaintiff, who makes title only by means of a conveyance of the land, would have no case. But the important and unexpected consequences which it was seen would flow from such an interpretation have caused the courts to hesitate; and in *House* v. *House* (10 *Paige*, 158), Chancellor WALWORTH decided that the millstones, bolts and machinery of a flouring mill were parcel of the real estate and descended to the heirs of the owner, holding, as I understand the case, that the rules of the common law upon the distinction referred to, still prevailed; and the present Chief Judge, in giving the opinion of this court in the case of *Murdock* **v.**

*Gifford* (18 *N. Y.*, 28), seemed inclined to adopt the conclusion of the Chancellor. But the point was not necessary to the decision of that case, as the fixtures there in question were held to be personal property, according to the former decisions, in any aspect in which the question might be presented. The reasoning of the Chancellor, in *House* v. *House*, is not altogether satisfactory to my mind; but as the judgment in that case may be said to have become a rule of property, it should not be disturbed without the greatest consideration, and certainly not in a case like the present, which may be satisfactorily disposed of on other grounds. *you please*

Assuming then that these kettles would be parcel of the real estate if the owner of the land was the unqualified owner of them when they were put up in the arch, we are to determine as to the effect of the arrangement in this case by which the owner of the land and the owner of the kettles agreed, that notwithstanding their annexation to the freehold in the manner which was contemplated, they should continue to be personal property so far as should be necessary to give effect to the personal mortgage. It will readily be conceded that the ordinary distinction between real estate and chattels exists in the nature of the subject, and cannot in general be changed by the convention of the parties. Thus, it would not be competent for parties to create a personal chattel interest in a part of the separate bricks, beams or other materials of which the walls of a house were composed. Rights by way of license might be created in such a subject, but it could not be made alienable as chattels, or subjected to the general rules by which the succession of that species of property is regulated. But it is otherwise with things which, being originally personal in their nature, are attached to the realty in such a manner that they may be detached without being destroyed or materially injured, and without the destruction of, or material injury to the things real with which they are connected; though their connection with the land or other real estate is such that in the absence of an agreement or of any special relation between the parties in interest, they would be a part of the real estate.

The cases respecting trade fixtures put up by a tenant sufficiently exemplify this distinction. Thus, in the case of the salt pans, which Lord MANSFIELD held belonged to the heirs, no doubt was entertained by him but that they might lawfully have been detached and taken away if they had been put in by a tenant. "It would have been a different question," he said, "if the Springs had been let and the tenant had been at the expense of erecting these salt works; he might very well have said, I leave the estate no worse than I found it." All the cases upon this branch of the law of fixtures proceed upon the idea that erections which would clearly be a part of the realty under ordinary circumstances, are personal chattels as regards the rights of a tenant who has put them up for the purpose of trade or manufacture. (*Penton* v. *Robart*, 2 *East*, 88; *Elwes* v. *Maw*, 3 *id.*, 38; *Buckland* v. *Butterfield*, 2 *Brod. & Bing.*, 55; *Holmes* v. *Tremper*, 20 *John.*, 29; *Miller* v. *Plumb*, 6 *Cow.*, 665.) If a subject which would otherwise be real estate can be made personal by the creation of special relations between the parties, it is clear that the same parties may effect the same thing by express agreement. Accordingly, it has been repeatedly held that erections which, by the general rules of law, would belong to the freehold, have become chattels in consequence of a contract to that effect between the owner of the land and the party claiming the erections as personalty. In *Smith* v. *Benson* (1 *Hill*, 176), a building used as a grocery and dwelling-house had been erected under an agreement with the proprietor of the soil that it might be removed at any time. One who claimed title under the party who erected it, but who had no interest in the land, mortgaged it as a chattel, and afterwards sold it as personal property. The question was between the motgagee and the subsequent purchaser, and the former was allowed to recover in trover against the latter, who had converted the house. In answer to the objection that the building was real estate and therefore not the subject of such an action, Judge COWEN said that *prima facie* such a building would be a fixture and would not be removable; that the legal effect of putting it on another's land would be to make it

Ford *v.* Cobb.

a part of the freehold. "But the parties concerned," he added, "may control the legal effect of any transaction between them by an express agreement." So in *Mott* v. *Palmer* (1 *Comst.*, 564), the defendant had sold and conveyed to the plaintiff by deed containing a covenant of seisin, a farm, certain of the fences standing upon which had been put up by a third person under an agreement with the defendant that he might take them off at his pleasure. This third party had recovered the value of the fences of the plaintiff, who had refused to let him take them off, in an action of trover, upon which the plaintiff sued the defendant, his grantor, for a breach of the covenant, and was permitted to recover the value of the fences. The recovery could be sustained only on the assumption that fences were *prima facie* parcel of the freehold, but might legally become personal property by force of such an agreement as was proved in the case. And in *Godard* v. *Gould*, in the present Supreme Court (14 *Barb.*, 662), the plaintiffs, had sold certain paper-making machinery, to be put up in a paper-mill, reserving, however, by express agreement, the title to the machinery as a security for the purchase money. It was accordingly put up, and afterwards the owner of the mill sold and conveyed it to the defendants, who had no notice of the plaintiffs' rights. The deed, besides describing the land on which the mill stood, purported also to convey all the machinery in it. The action was for the conversion of the machinery by the defendants; and a recovery in favor of the plaintiffs was sustained by the court. It was considered that the machinery was personal property, by force of the arrangement under which it was placed in the mill, though its mode of annexation and adaptation to the purposes of the mill were such that it would have passed by a simple conveyance of the real estate but for the agreement by which the plaintiffs retained the right of property in it. Many other cases to the same effect will be found referred to in *Hilliard on Real Property* (*ch.* 1, §§ 18–28).

It is conceded that there must necessarily be a limitation to this doctrine, which will exclude from its influence cases where

the subject or mode of annexation is such that the attributes of personal property cannot be predicated of the thing in controversy. Thus, a house or other building, which from its size or the materials of which it was constructed, or the manner in which it was fixed to the land, could not be removed without practically destroying it, would not, I conceive, become a mere chattel, by means of any agreement which could be made concerning it. So of the separate materials of a building, and things fixed into the wall, so as to be essential to its sup port; it is impossible that they should by any arrangement between the owners become chattels. The case of *Fryatt* v. *The Sullivan Co.* (5 *Hill*, 116), was correctly decided upon this distinction. A certain steam engine and boiler were leased, and the lessees took them to their smelting works, and affixed them so firmly to the freehold that they could not be removed without destroying the building in which they were placed. The defendants made title to the building, under a mortgage executed after the engine had been thus annexed, and the owner of the engine and boilers brought trover for them. It was held, that the articles had been converted into real estate, and that the remedy of the plaintiff was against the party who wrongfully converted them from personal into real property; and that the action could not be sustained against the owners of the real estate.

The question in the present case, therefore, is, whether the method in which these salt kettles were affixed to the freehold was such that they can still be claimed as chattels, upon the principle of the first mentioned cases, or whether they are to be considered as real property within the one last referred to. There is no pretence that they were necessary to the support of the building, or that their own condition was essentially changed, or their value diminished, by being detached from the arch. They were of value after being removed, as second-hand kettles, and could be again put up in another arch; but taking them out involved the displacement of certain of the bricks of which the arch was composed. I do not think this a controlling circumstance, especially as it is found by the

referee, that they required to be taken out and re-set as often as once a year, in the ordinary course of the business of manufacturing salt. This involved a certain amount of expense, whether it was done for the purpose of re-setting, or with a view of finally disconnecting them with the arch. I do not think that it required any such destruction of the subject, or serious damage to the freehold to which they were attached, as to render void the arrangement by which it was agreed that they should continue to be personal property, for the purpose of removal, in case default should be made in the payment of the purchase money. They were not so absorbed or merged in the realty, that their identity as personal chattels was lost; and unless such an effect has been produced, there is no reason in law or justice for refusing to give effect to the agreement, by which they were to retain their original character.

I conclude, therefore, that the defendants were entitled, as against O. W. Titus, to detach the kettles from the arch and take them away, after default had been made in the payment of the purchase price; and the only remaining question is, whether the plaintiff is in any better position than that which Titus occupied. The kettles were originally personal property. The agreement contained in the chattel mortgage preserved their character as personalty, which would otherwise have been lost by their annexation. They, therefore, continued to be personal chattels notwithstanding the annexation; and the plaintiff, by filing the mortgage, observed all the formalities required by law to preserve their lien upon that kind of property. The title to the kettles did not, therefore, pass by the conveyances to the plaintiff. Those conveyances embraced only the interests which the grantors had a right to dispose of, including any advantage which would accrue to the grantee by the laches of the former owners, in giving the constructive notice which the law required to be given; but I do not see that any such laches occurred. This seems to me the true state of the case upon principle. But it is also sustained by authority. The case of *Mott* v. *Palmer*, already referred to, necessarily involved this point. It was held, that the covenant

Ford *v.* Cobb.

of seisin was broken at the time of the execution of the deed, because the fences which were embraced in the general descrip tion of the property professed to be conveyed, did not pass by it; and the reason they did not pass was, that they had been saved from merging in the freehold by an agreement in cha- racter precisely like the one set up by the present defendants. If it could have been maintained that they passed by the deed, because they were apparently parcel of the realty, and because the grantee had no notice of the special arrangement, no recovery for a breach of the covenant of seisin could possibly have been sustained. This decision, pronounced by our predecessors in this court, is of the highest authority with us, and is decisive of the point. There is a case equally in point, in the Su- preme Court of New Hampshire. The action was trover for a saw-mill, mill chain and dogs. The defendant made title under a deed of the land on which the mill stood; and the evidence showed that he had no notice of the special facts upon which they were claimed to be personal property. Those facts were, that the defendant's grantee, the owner of the land, was a party to an arrangement by which that mill had been sold to the plaintiff as personal property. It was decided that the action was maintainable, and the plaintiff had judgment. (*Russell* v. *Richards*, 1 *Fairf.*, 429.) The case of *Godard* v. *Gould*, before referred to from the reports of the present Su- preme Court of this State is to the same effect.

These considerations lead to a reversal of the judgment of the Supreme Court in the present case, and to the award of a new trial.

JOHNSON, Ch. J., STRONG, ALLEN, GRAY and GROVER, Js. concurred. COMSTOCK, J., dissented.

Judgment reversed, and new trial ordered.