# APPENDIX A.

## DECISIONS NOT APPEALED FROM AND NOT HITHERTO REPORTED.

A. J. CARTWRIGHT, W. F. ALLEN AND W. O. SMITH,
RECEIVERS, *vs.* H. A. WIDEMANN.

REPLEVIN.   DECISION RENDERED MARCH 3, 1892.

Heard in vacation by consent as of the April Term, 1892,
the jury having been waived.

OPINION OF JUDD, C.J.

On the 16th of January last the plaintiffs were appointed
receivers of the property of the Union Iron Works Company,
a domestic corporation in an insolvent condition, and, in pur-
suance of authority from the court, brought this action of
replevin.   As the matter was urgent, both parties by written
stipulation waived trial by jury and agreed that the case be
heard by me in advance of the term when it would be regu-
larly returnable.   The case was presented on the 25th Feb-
ruary.   I find the following essential facts from the evidence
adduced.

The Union Iron Works Company were duly incorporated
by charter of the Minister of the Interior on the 1st day of
March, 1890 ; the charter was accepted, officers elected and
by-laws passed and the operations of the company in estab-
lishing and maintaining a foundry and machine-shop carried
on.   On the same day the charter was issued, a lease was
executed between H. A. Widemann (defendant) and the cor-
poration by its president J. N. S. Williams and its secretary
Robert More, of the premises on which the works of the

corporation were in part situated, for the term of fifteen years, with the privilege of a further term of fifteen years, the rent being $2000 a year for the first three years and $2500 a year thereafter, payable quarterly; the lessee paying taxes and water rates.

On the 13th day of November, 1890, another lease was executed between H. A. Widemann (defendant) and the Union Iron Works Co. by the same officers. The lease was for the same land demised in the indenture of March 1st and some additional land, for the term of fifteen years from the 1st of January, 1891, with the privilege of a further term of fifteen years, the lessee to pay $3800 per annum for the first two years and two months of the term, and $4300 per annum for the remainder of the term or extension thereof, quarterly, at the end of each three months from January 1st, 1891, and also taxes and water rates. It contained this clause: "It is understood and agreed that this lease includes the property and leasehold in a certain lease between the parties dated March 1st, 1890, and that said lease is surrendered and cancelled, to take effect January 1st, 1891."

On the 29th day of December, 1890, the Union Iron Works Co., duly authorized by a vote of its stockholders, executed an "Indenture of Mortgage" to A. J. Cartwright, W. F. Allen and William O. Smith as trustees, of "all its franchises, leases, leaseholds, plant, stock, contracts and property now held, owned or controlled by it, more particularly described in the schedule hereunto attached," and after acquired property.

The object of this indenture is expressed to be the securing of bonds of the company to the amount of $50,000 and interest, about to be issued by the company.

It contained *inter alia* a clause in the part stating the trust, that the company was allowed to use and occupy the premises and property and take the income and profits until default.

The trustees had power to enter and take possession of the property and carry it on for the benefit of the bondholders upon default for thirty days in the payment of the

bonds or interest or upon breach of any of the covenants; also, if the trustees find it impossible to pay the bonds, on a vote of the bondholders, they are authorized to sell the property and pay the bonds, etc.  And if the company should pay the bonds, then "these presents shall be void."

The company bound itself *inter alia* " to pay all rents coming due on any leases held by it."

The schedule of the property conveyed in the indenture contains the following:

" Lease.   H. A. Widemann to Union Iron Works Co., dated March 1st, 1890.

" Recorded in Registry Book......page......

" Lease.   H. A. Widemann to Union Iron Works Co., dated November 13th, 1890.

" Recorded in Registry Book......page......"

On the 9th day of October, 1891, the company, in pursuance of the authority given by its stockholders, executed another indenture of mortgage to the same trustees to secure the payment of bonds of the company to the amount of one hundred and fifty thousand dollars about to be issued, the avails of which bonds were (1), to cancel the previous issue of $50,000.   (2), to pay existing creditors and (3), to carry on the company's business.   The property conveyed was the same in terms as described in the indenture of 29th December, 1890, and in the schedule appended, the lease is mentioned of " H. A. Widemann to Union Iron Works Co., dated November 13th, 1890, recorded in Registry Book 128, page 400–1."

This indenture provided that it was subject to the property described and embraced in the deed of trust of December 29th, 1890, and created a second lien upon that property until the bonds by it secured were paid or exchanged for bonds issued under the second indenture (of October 9th, 1891.)

On the 12th of January last, the defendant, Mr. Widemann, rent for two quarters being due and unpaid and, having frequently demanded the same of the treasurer, and once of Mr.

A. J. Cartwright, one of the trustees, notified the manager, Mr. J. N. S. Williams, that he intended to take action. The company thereupon paid off the men and dismissed them, and on the morning of the 13th of January, Mr. Widemann proceeded to the works of the company with a competent engineer, Mr. Cushingham, and began to distrain and remove certain property found on the premises, claiming to do so by virtue of the statute of 1864, for arrears of rent. The work of removal occupied the 13th and 14th of January, and was completed on the morning of the 15th. The goods were removed to "a place of safe custody," being an iron warehouse near by, were kept there by Mr. Widemann for fifteen days, then were advertised by him for sale, and the fifteen days' notice of sale required by statute was about expiring, when the property was replevied in the suit now before me.

One of the trustees on learning of Mr. Widemann's action, went to the works of the company on the 14th of January and told the officers of the company that he took possession of the property. The distraint was going on at the time and was not interrupted. Later on in the day the bondholders and the stockholders of the company held meetings, and voted that the trustees should apply to the court for the appointment of receivers, for foreclosure of the mortgage and for winding up the company. Mr. Widemann was notified by counsel for the trustees on the afternoon of the 13th to desist from further removal of the property. The distraint was completed on the morning of the 15th of January, and on the 16th the application to court was made and the receivers appointed. I mention these facts but do not consider them as important, for the distraint was begun and completed by the landlord before the appointment of the receivers.

The testimony is that the property distrained consisted of four lathes, a brass lathe, an emery wheel, a drill press, a milling machine, a shaping machine, a grinding machine and two cases of tools. They were detached from the building where fastened, taken to pieces and carted away. They are all scheduled in Exhibit E on file, and valued by the defen-

dant at $5,000, and according to the invoices at over $8,000. Machine number five on the schedule was not fixed at all to the building; machine number one not fixed to foundation, but overhead. Numbers two and six were fastened by bolts through the floor; that is, the wooden flooring was taken up and the bolts holding the machine in place were let through cross sleepers of wood sunk in the ground below. Numbers nine, ten, eleven and twelve were secured in the same way as numbers two and six, but screws were used instead of bolts. All the machines except number five, had belts which ran through pulleys connected with shafting which were fastened to the framework overhead, and through this means power was communicated to them from the main shafting, and they were thus kept in motion. I am satisfied that they were removable, and were removed without injury either to themselves or to the fabric of the building, also, that the object of their annexation to the ground was in order to keep them steady, and the attachment overhead was for the purpose of communicating steam power to them, both being in order to the more complete enjoyment of the machines as chattels. The conclusion of law which I deduce from the above is, that they were not "fixtures" as between landlord and tenant. The statute authorizes the distraint and removal of the "goods and chattels" of the defaulting tenant. The property taken by defendant were "goods and chattels" within the statute.

An important case on this subject is *Hellawell vs. Eastwood*, 6 Exch., 295. Here it was held that "cotton spinning machines called 'mules,' set up by a tenant on the demised premises, some of which were fixed by means of screws to the wooden floor, and some by screws which had been sunk into holes in the stone flooring, and secured by molten lead poured into them, the object of the annexation being not to improve the machine, but merely to render the machine steadier and more capable of convenient use as chattels, were not a part of the freehold, and were distrainable for rent."

A note to the American edition of Smith's Leading Cases

where *Hellawell vs. Eastwood* is dicussed, states that this case is at variance with many cases in the United States. (*Simpson vs. Hartopp*, vol. 1, part 2, Smith's Leading Cases, 736.) In notes to *Elwes vs. Mawe*, 2 Smith's Leading Cases, p. 221, the American editor says, the cases are "obviously irreconcilable" as to what "fixtures" are. See *Corliss vs. McLagin*, 29 Me. 115, and *Winslow vs. Ins. Co.*, 4 Met. 306, where engines, etc., are held to be *fixtures*. Undoubtedly the rule as to fixtures is different between mortgagor and mortgagee, heir and executor, landlord and tenant. Without going into this discussion very deeply, I find that the following cases would sustain the contention of the defendant in this case.

In *McCrea vs. Bank*, 66 N. Y., 489, the question was between mortgagor and mortgagee. The court held that the criterion of a fixture is the union of three requisites ; (1), actual annexation to the freehold ; (2), application to the use or purpose to which that part of the realty to which it is annexed is appropriated; (3), the intention of the ' party making the annexation to make a permanent accession to the freehold.

In *Sissons vs. Hibbard*, 75 N. Y., 542, an engine and boiler held not to be a fixture, it not being the intention to make a permanent annexation to the freehold, the parties having agreed to consider the engine and boiler personal property.

*Ford vs. Cobb*, 20 N. Y., 344, decides that the intention with which the chattels are annexed aids in determining whether they retain their character as such, limited by the subject or mode of annexation as when the property could not be removed without destroying it or where it is essential to the support of that to which it is attached.

*Tift vs. Horton*, 53 N. Y., 380, "Chattels may be annexed to the real estate and still retain their character as personal property." This is followed in *Hendy vs. Dinkerhoff*, 57 Cal. 3 ; *Rogers vs. Brokaw*, 25 N. J. Eq., 496 follows, *McCrea vs. Bank.*

Here it is decided that whether fixture or not, depends on facts, and not on the opinion of the person making the

annexation, and that moveable machines, whose number and permanency are contingent upon the varying conditions of the business differ from engines and boilers and other articles secured by masonry and designed to be permanent and indispensable to the enjoyment of the freehold.

Having found that the articles distrained were not fixtures, I now consider whether they were the property of the tenant.

They had been conveyed to the trustees by the mortgage to secure the bonds; but they were allowed to remain in the custody of the company mortgagor. But as the leases were also assigned to the trustees by the same instrument *(vide supra)* it becomes a matter of indifference to the defendant whether the title to the property and in the leases remained in the Union Iron Works Company or was in the trustees. He had a right to his rent in either case, and as the receivers, (plaintiffs) represent both the corporation and the trustees of the bondholders, it is immaterial in this part of the discussion to settle which body were the tenants.

The questions of greater difficulty than the above are those raised by plaintiffs that the defendant as landlord had no *lien* and therefore the deed of trust (or mortgage) was effective to transfer the title to the trustees and so the property seized is not that of the tenant. In jurisdictions where the landlord has a *lien* by statute dating from the beginning of the tenancy, the defendant's lien would be junior to that of the incumbrancer—the trustees.

I consider the latter point first, and call attention to the stipulation in the second lease of 13th of November, 1890, that the prior lease (of March 1st) is cancelled and surrendered *to take effect January* 1st, 1891. I hold that this means that the lease of March 1st, 1890 was in full force and effect until 1st January, 1891, when the new term began. The tenancy existed therefore prior to the mortgage of 29th December, 1890. This view is sustained by *Rollins vs. Proctor*, 56 Ia., 326. Our case is stronger, even, for the new lease was made before the mortgage and was assigned to the

trustees in the mortgage. The question therefore is, whether a landlord's right to distrain the goods of a defaulting tenant is defeated by a subsequent mortgage by the tenant of the goods. I should be loath to so hold. I can find no case where a subsequent mortgage has priority over a *statutory lien* of a landlord. The cases must necessarily all be the other way. See *Beall rs. White*, 94 U. S., 383. The title of the Act of 1864, "An Act to facilitate the recovery of rent" would be a false title if it could be defeated in this way. But if the landlord has no lien on the goods before he impounds them, it is difficult to see how he can keep them against a bona fide incumbrancer. *In re On Chong*, 7 Haw., 376, was decided on the ground that the title of the bankrupt's goods passed to his assignee and so the claim for rent was not a preferred one. In this case the landlord had not distrained the goods before the failure. Our statute gives the right to the landlord to distrain and remove the goods of a defaulting tenant found in the premises, and makes no exception in favor of others having liens upon the same, and does not the right of the landlord to seize the goods become a fixed lien when he actually seizes the goods?

Jones on Liens. Sec. 540 says: "At common law the landlord had no lien upon the tenant's goods; but he has a right to seize or distrain the goods found upon the leased premises for rent due and unpaid. This right of distraint may in some sense be called a lien, though it differs essentially from the landlord's lien created by statute. One essential difference is, that by the common law process no fixed lien upon the property existed *until the property was actually seized* or levied upon; while by statute a lien is ordinarily imposed upon the property from the beginning of the tenancy."

But I am unable to find that our statutes create a lien upon the goods of a tenant *from the beginning of the tenancy*, and therefore the right of distress of a landlord could be defeated by a bona fide subsequent mortgagee who takes actual possession of the goods before the distraint is made.

In our case this was not done.   To defeat the distraint the mortgagee would have to *take* the goods and the trustees did not do this.   The seizure by defendant was therefore valid.

But, however this may be, the trustees had title to the property and in the lease by the indentures of 29th December, 1890, and of October 9th, 1891, though not in actual possession.   I regard the trustees as the tenants, so far as this defendant is concerned, and the property being theirs under the indentures, they were liable for the rent, and so the distraint complained of was legal and proper.   See *Hop Sing vs. Kam On*, 7 Haw., 144, and Taylor's Landlord and Tenant, Sec. 455.

The plaintiffs claim that the distress was illegal because the title to the property seized was in the trustees and not in Union Iron Works, but by the same instrument they were assignees of the lease.   They cannot claim the property without the burdens incident thereto, one of these is the liability for rent.

The goods, so far as defendant was concerned, were those of a defaulting tenant.

Judgment for defendant.

*A. S. Hartwell*, for plaintiffs.

*P. Neumann* and *F. M. Hatch*, for defendant.