GAYNOR, J. The car in which the plaintiff was hurt was passing a truck which was going in the same direction to its right on the Brooklyn Bridge. The evidence shows that the front of the car cleared the rear left hand corner of the platform or floor of the truck by about one inch, and that the said corner caught the third upright stanchion of the car and ripped it and all the succeeding ones out, the car being an open one. The verdict was against both the railroad company and the owner of the truck. The latter has not appealed. That the driver of the truck was found negligent does not relieve the appellant of the charge of negligence. It owes the duty to its passengers of reasonable care to avoid collision with even negligent drivers. While the request of counsel for the appellant to charge "that there was no obligation on the part of this motorman to stop the car until the danger became apparent" was in itself correct, it was not error to refuse to charge it, for it was only a detail embraced in what the court had fully charged. A trial judge is not required to charge such repetitious requests. Nor was the court required to charge as requested that the refusal of the court to dismiss "is not an intimation of the court upon the facts of the case." Such crudities should not be presented by counsel. It was the duty of the trial judge to have the jury correct their verdict of $500 against each defendant, as he did, by instructing them that the verdict must be against the defendants jointly for the amount of the plaintiff's damage, which they found to be $1,000.

The judgment and order should be affirmed.

Judgment and order unanimously affirmed, with costs. All concur.

---

### NIAGARA FALLS HYDRAULIC POWER & MFG. CO. v. SCHERMERHORN.

(Supreme Court, Trial Term, Niagara County. June, 1908.)

**1. BANKRUPTCY—LIENS—VALIDITY AS AGAINST TRUSTEE.**

Under Bankr. Act July 1, 1898, c. 541, § 67, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), providing that claims, which, for want of record or for other reasons, would not have been valid liens against the claims of the creditors of the bankrupt, shall not be liens against his estate, a trustee in bankruptcy of a mortgagor has the same rights as a judgment or execution creditor.

**2. LANDLORD AND TENANT—LEASES—ERECTIONS ON LAND—OWNERSHIP—TERMINATION OF LEASE.**

A lease providing that, in case it should be terminated for any cause before a specified date, the erections placed on the land by the lessee should become the property of the lessor, was valid, and not contrary to public policy.

**3. BANKRUPTCY—LIENS—NATURE OF INSTRUMENTS—FILING.**

A lease providing that, if terminated for any cause before a specified date, the erections placed on the land by the lessee should belong to the lessor, did not partake of the character of a chattel mortgage, and was therefore enforceable as against the lessor's trustee in bankruptcy, though not filed.

**4. LANDLORD AND TENANT—LEASES—CONSTRUCTION.**

A lease provided for quarterly payments of rent, and for termination on 30 days' notice for nonpayment of rent. It also declared that, if terminated for any cause before a specified date, the erections thereon should

belong to the lessor, and that after such date the lessor might hold such erections, etc., as collateral security for any amount due. The lease also provided that the lessor should give 30 days' notice of its election to terminate the lease, whereupon at the expiration of that time the lease should be terminated as if the whole term had expired. *Held*, that the lease could not be construed as giving to the lessee the same rights in the buildings, etc., placed on the land in case of the premature termination of the lease, as it would have had the lease continued for the stipulated time.

5. FIXTURES—WHAT ARE FIXTURES—REMOVABILITY.

The fact that certain articles claimed to be trade fixtures might have been removed without affecting the stability of the buildings to which they were attached, while forming an element in determining whether the article were fixtures, is not a controlling test.

6. SAME.

Whether things affixed to the freehold preserve their character of personalty depends on their essential character and the mode in which they are annexed, and whether that can be removed without serious damage to the freehold, or substantially destroying their own qualities and value.

7. SAME—MANUFACTURING PLANT—BUILDINGS.

Where a plant for the manufacture of caustic soda and other by-products of salt by electricity was erected on leased land, and the lease provided that if it was terminated before November 15, 1909, the buildings could not be removed, not only the building materials that went into the construction of the buildings, but also such fixtures and attachments as were built into and constituted a part of the plant which could be utilized for no other purpose, were a part of the "buildings," and were not removable, either under the contract or as trade fixtures.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 1, pp. 889–899; vol. 8, p. 593.]

8. SAME—SEVERANCE.

Where buildings and appliances therein erected on leased land were not removable by the lessee on termination of the lease, but were fixtures, the fact that such appliances were severed by fire which destroyed the plant did not entitle the lessee's trustee in bankruptcy to claim the débris as personal property to which the bankrupt was entitled.

9. LANDLORD AND TENANT—LEASES—TERMINATION—CONDITIONAL LIMITATION —FORFEITURE.

Where a lease provided that if at its termination all rent had been paid, the lessee might remove buildings, fixtures, etc., but that the buildings should not be removed if the lease was terminated prior to November 15, 1909, in which case the buildings should belong to the lessor, and that, in case of nonpayment of rent, the lease might be terminated on 30 days' notice, such provision for termination was a conditional limitation, and not for a forfeiture, and hence no demand made on the premises on the day when the rent became due was necessary to entitle the lessor to claim a termination of the lease.

Action by the Niagara Falls Hydraulic Power & Manufacturing Company against Julian H. Schermerhorn as trustee in bankruptcy of the Acker Process Company. Judgment for plaintiff.

Romer & Harrington, for plaintiff.
Louis Marshall, for defendant.

WHEELER, J. This action is brought by the plaintiff to recover the value of certain property taken from the land of the plaintiff and disposed of by him in alleged violation of the plaintiff's rights and ownership.

There is no substantial dispute as to any of the facts in this case. The essential facts are that the plaintiff is a corporation engaged in

the development and sale of electric power at Niagara Falls. The Acker Process Company was a corporation organized for the purpose of manufacturing caustic soda, bleaching powder, bichloride of tin, and other by-products from common salt, by an electric process, which required the use of powerful electric currents in large quantities. The plaintiff owned a tract of land in the neighborhood of its plant, and on·the 14th of June, 1899, entered into a written contract with the defendant, by which the plaintiff leased to the defendant the land in question for a period of 25 years. The defendant agreed to pay for the land a stated rental. The process company further agreed to erect on the land a plant for the manufacture of the products named. The power company agreed to supply and deliver to the process company the necessary electrical power, and to that end to install certain turbines and the other necessary appliances for the furnishing of the required current, for which the power company agreed to pay $17.50 per electrical horse power. The price for the power and rental, it was agreed, should be paid quarterly. The process company entered into possession, erected its plant and the power company installed and delivered the required power according to agreement. On the 25th of February,. 1907, the plant of the process company was destroyed by fire. At that time the process company was in arrears for rent of land and power delivered, amounting to upwards of $20,000.

By the seventh paragraph of the agreement between the parties it was provided as follows:

"Payment for power shall be made on the 10th days of May, August, November, and February, as above stated, and shall be made by the lessee promptly and without any regard to any counterclaims whatever, if any exist. If such payment for power shall not be made promptly when due, the lessor may at its election, terminate this lease upon the following conditions: The lessor shall give the lessee thirty days' notice of its election and intention so to terminate the lease, whereupon this lease and agreements shall be terminated at the expiration of thirty days from the service of such notice, to the same extent and·effect as if the term of twenty-five years hereinbefore provided shall have expired; but, if the lessee shall within said thirty days pay or tender said rent and interest thereon, such notice shall be deemed to be of no effect, and shall be considered as never having been served. Any claim or demand which the lessee may have or claim to have against the lessor shall, if disputed, be the subject of suit or adjustment against the lessor, but shall not be an offset or counterclaim against any claim for rent hereunder."

In pursuance of the authority contained in this clause, the power company on the 1st day of May, 1907, served on the process company written notice of its election to terminate the lease, which thereby terminated and expired 30 days from the giving of the notice. In the meantime proceedings in bankruptcy were taken against the process company in the United States District Court of New Jersey. April 22, 1907, it was adjudicated a bankrupt, and on May 20th the defendant was elected and appointed its trustee in bankruptcy, qualified as such, and at once entered into possession and occupation of the demised premises and of the wreckage remaining thereof after the fire of the February prior.

The lease or agreement between the parties among other things contained the following provisions, to wit:

"Sixteenth. At the termination of this lease and agreement either by notice or by expiration of the term or for any cause hereunder, the lessee may, except as hereinafter provided, if all rental hereunder has been paid, remove from the premises leased hereunder or under any subsequent lease all the buildings, machinery, fixtures, and other property of the lessee erected or placed on said premises by it, all of which is hereby regarded as personal property, but said buildings of the lessee shall not be removed from the said premises if this lease be terminated prior to November 15, 1909, but in case of the termination hereof prior to November 15, 1909, said buildings shall become and be the property of the lessor, nor shall said buildings or machinery of the lessee be removed from said premises subsequent to November 15, 1909, unless all rents hereunder reserved are fully paid as herein agreed, and, if such rents or any part thereof shall remain unpaid, the said buildings, machinery, fixtures, and property of the lessee shall be held by the lessor as collateral security for the payment thereof. During the term of this lease and agreement the lessee may erect or place upon the premises leased hereby or by any subsequent lease by the lessor all such buildings, machinery, fixtures, and other property as may be necessary or proper for the purpose of its business as herein-above described."

By virtue of the provisions of this clause, the power company claim-ed ownership in all the wreckage of buildings and machinery left by the fire. The trustee in bankruptcy, on the other hand, contended, in substance, that the clause in question amounted to nothing more than a chattel mortgage, and that, inasmuch as the agreement had never been filed as a chattel mortgage, it was void as against him, as rep-resenting creditors, and he had a right to appropriate and dispose of the wreckage, which he proceeded to do in spite of the written pro-test of the power company calling attention to its claims to owner-ship under the agreement. This action is therefore brought to recover the value of the property taken from the leased land, consisting of the wreckage of buildings, machinery, and fixtures left after the fire. Va-rious defenses were also interposed by the defendant which will re-ceive attention at the proper time.

At the very outset of this opinion, it is perhaps well to observe that, if the wreckage is to be treated purely as personal property and the agreement in question expressed in the sixteenth clause deemed a chattel mortgage for the securing of the payment of rent, then the fact that the agreement was not filed as a chattel mortgage would doubtless give the defendant the right to the ownership of the prop-erty in dispute freed from any claim of the power company. Coun-sel for the power company contends that, even though void as against creditors, the agreement would be valid between the parties to it, and that the trustee in bankruptcy got no better or superior rights than the process company had. This position, however, is not ten-able. By section 67 of the national bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]) it is expressly provided that "claims which for want of record or for other reasons would not have been valid liens against the claims of the creditors of the bankrupt shall not be liens against his estate," and it has ac-cordingly been held that a trustee in bankruptcy of a mortgagor has the same rights as a creditor armed with the attachment or execution. Zartman v. First National Bank, 189 N. Y. 274, 82 N. E. 127, 12 L. R. A. (N. S.) 1083; Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885. It therefore becomes necessary for this

court to construe the provisions of the agreement and to determine whether it in law or in fact is to be deemed to have the essential nature of a chattel mortgage and subject to the requirements of the act relating to chattel mortgages as to filing in order to make them valid as against creditors.

The sixteenth clause of the instrument clearly anticipates two distinct emergencies: One a cancellation or termination of the lease prior to November 15, 1909; and the second a termination after that date. The rights and privileges of the parties are different in the two cases. If the lease was terminated before November 15, 1909, the buildings erected on said premises were to become the property of the lessor. The right to remove them and the machinery and fixtures in any event, whether the termination was before or after November, 1909, depended on the full payment of all rental due. In the event of the termination of the lease and agreement after November, 1909, the lessor had the right to retain the buildings and machinery as collateral security for the payment of such rents as shall remain unpaid. In other words, if the lease was terminated prior to November, 1909, the buildings and machinery were to become the absolute property of the power company, but, if the lease was terminated subsequent to 1909, the power company only had the right to retain the buildings and machinery as security for unpaid rent, which of course, implies the right of redemption on the part of the process company by the payment of any balance of rent unpaid. There was a manifest reason for the parties making this difference as to their rights in the property in the different contingencies, for it appears from the testimony given on the trial that, in order to enable the power company to put itself in condition to supply the power contracted to be delivered, it had to expend upwards of $100,000, in installing new turbines, dynamos, and transmission lines. If the lease continued in life long enough, the rental to be paid would reimburse the power company for this outlay, but, if the venture resulted disastrously before 1909, the lessor would have been a large loser in special machinery not readily adapted to other purposes. In order to guard as much as possible against such a contingency, the parties agreed, in substance, that there should be no right to remove buildings and machinery at all, but that they should become the property of the power company if the lease was terminated for any cause prior to November 15, 1909. The defendant's counsel argues that inasmuch as by the seventh clause of the agreement it is provided that, upon the termination of the lease for the nonpayment of rent, "the lessor shall give the lessee thirty days' notice of its election and intention so to terminate the lease, whereupon this lease and agreement shall be terminated at the expiration of thirty days from the service of such notice, to the same extent and effect as if the term of twenty-five years hereinbefore provided shall have expired," therefore the process company had the same rights in the buildings, machinery, and fixtures as it would have had had it continued in force the full 25 years. This argument we cannot accept. To place such a construction on the instrument would in our opinion do violence to

the plain intent and purposes of the parties as clearly expressed in the sixteenth clause of the contract. We then have presented to the court a case where the parties to a written agreement expressly covenanted that, in case a lease should for any cause be terminated before a certain date, the erections placed on the leased land should become the property of the lessor. Such an agreement is perfectly valid in law, and there is no reason of public policy why the courts should not enforce it. Such an agreement partakes nothing of the character of a chattel mortgage, and the provision of the statute requiring the filing of a chattel mortgage has no application to it, nor is it a matter of any consequence, in view of the terms of the agreement, whether the property upon which it operates is to be deemed personal or real in its nature.

Defendant's counsel contends that the provision of the agreement governing the right of the parties in the event of a termination of the lease prior to November 15, 1909, was an attempt to create a lien on the buildings, machinery, and fixtures "as collateral security for the payment thereof," and therefore he argues that the agreement must be treated as a chattel mortgage, citing in support of his position McCaffrey v. Woodin, 65 N. Y. 459, 22 Am. Rep. 644, Wisner v. Ocumpaugh, 71 N. Y. 113, and other cases. We think the learned counsel fails to distinguish between the case presented where the lease is terminated prior to November, 1909, from that presented where the termination is subsequent to November, 1909. As already pointed out by the court, where the termination of the lease is made prior to November, 1909, the buildings on the premises leased became the absolute property of the power company. The power company was not given a lien as security for unpaid rent, but the title to the erections passed to the lessor, and it had a right to retain and dispose of them, and is not required to account to the process company for any of the proceeds. On the other hand, where the termination was after November, 1909, and the process company had continued as tenant to that time the power company only had a lien on the buildings and machinery "as collateral security for the payment" of unpaid rental. In that case the agreement partook of the character of a chattel mortgage. That portion of the sixteenth clause of the agreement reading, "Nor shall said buildings or machinery of the lessee be removed from said premises subsequent to November 15, 1909, unless all rents thereunder reserved are fully paid as herein agreed, and if such rents or any part thereof shall remain unpaid, the said buildings, machinery, fixtures and property of the lessee shall be held by the lessor as collateral security for the payment thereof," applies only to the case of the termination of the lease subsequent to November 15, 1909, and has no application to the other alternative of a termination prior to November 15, 1909, when the agreement provides the rights and interests of the parties shall be entirely different. The question remains for determination just what and how much of the wreckage remaining after the fire of February, 1907, may be legally claimed by the plaintiff to be embraced within the provisions of the sixteenth clause as belonging to it. This is perhaps the most difficult of solution of all the questions involved.

The plant was built for the manufacture of caustic soda, bleaching powder, and other by-products from common salt, and electricity was largely employed, not only for power, but also by means of. a direct application of its currents in the reduction of the common salt into the products manufactured. The process was one invented and perfected by Mr. Acker, from whom the company took its name. The entire plant was laid out and designed to carry on these peculiar processes, and the plant and process employed are accurately and. fully described in the testimony of the witness Mr. Otis E. Acker. His testimony covers nearly 150 pages of stenographer's minutes, and it is impossible within the limits of an opinion to set forth the various processes used and the mode of construction and attachment of the various parts of the machinery employed. In a general way, it may be said that common salt was conveyed by machinery from a storage house and placed in a large number of receptacles called "furnaces," standing upon and imbedded into brick piers or mason work, supplied with proper flues or conduits. An electric current was then applied by means of proper cathodes and anodes specially designed for the purpose, which in connection with injections of steam caused the decomposition of the salt into caustic soda and chlorine gas. The caustic soda was drawn off from these chambers into settling pots set into the floor of the building, and,. after settling, packed into drums and sold in the market. The chlorine gas separated from the other constitutents of salt was conducted from the furnaces or chambers through ducts or openings in the piers or foundation supports to the furnaces, and through pipes and proper conduits to a separate building called the bleachhouse. The gas was there led into a series of cylinders or bleach machines called "absorbers," 32 in all, each machine consisting of six cylinders placed one above the other and connecting with each other. In each cylinder was a worm or screw revolved by gear wheels. Into these cylinders was placed lime, and by the operation of the worm or screw the lime was gradually moved through these cylinders and brought into contact with the chlorine gas, which was also introduced or led into the cylinders or absorbers. The lime and the gas combining made chloride of lime, another commercial product sold by the process company. There were other parts of the plant specially designed to care for and manufacture other things which I may call by-products. To accomplish these results in the construction of the plant was employed numerous dynamos, electric cables, copper bus-bars, pipes, and piping, wooden conduits lined with lead, tanks, and other appliances, all. more or less bolted securely together, and most of them fastened securely to. the floor and walls, or to other beams and supports or framework which went to make up the plant. The process as stated was practically a continuous one, and each and every part of the plant was necessary to every other part of the plant. The plant was designed and constructed to operate as a unit, and practically no part of it could be taken out without destroying the usefulness and efficiency of all the rest. This does not apply to the machine shop which was in a separate building, where lathes and machines of that character were placed. When the fire came, there was a total destruction of the usefulness of this plant, and the principal thing left

was the brick walls of the buildings; a mass of iron, twisted I-beams, steel girders, floor plates, iron furnaces, absorber cylinders, and things of that kind, and, in addition, a large amount of lead which had been in the form of lead piping or lead lining to tanks and to conduits employed for conducting the chlorine gas, which the heat of the fire had melted and which were dug out of the ashes and débris. The same thing was true of a large quantity of copper which had constituted the cables, bus-bars, and other means for conducting the electric current used in the process of manufacture.

The power company makes no claim to lathes and such machines as were found in the machine shop, which could be readily taken out without destroying the efficiency of the process plant proper, but it does insist that the furnaces and their connections and appliances, the absorbers and their appliances—in short, those things which went into the construction and were necessary to the operation of the plant as a whole, attached as they were—are to be treated and regarded as realty, as a part of the buildings, and it insists that, when the lease was terminated, these became the property of the power company under the sixteenth clause of the agreement. On the other hand, the trustee in bankruptcy contends that they were mere trade fixtures which are to be deemed personal property, and that, as such, the defendant had a perfect right to remove and sell them which he did. It is often difficult to determine just what is removable as a trade fixture and just what becomes, when attached, a part of the realty or building. In determining each particular case some general rules, however, are applicable, and must be borne in mind. It is possible we imagine that many of the things enumerated above might have been removed without affecting the stability of the buildings proper. That fact may be an element in determining whether a given fixture is realty or personalty; but is not after all the controlling test. Whether things affixed to the freehold preserve their character of personalty depends largely upon their essential character, and the mode in which they are annexed, and whether they can be removed without serious damage to the freehold or substantially destroying their own qualities and values. Ford v. Cobb, 20 N. Y. 344. In Tifft v. Horton, 53 N. Y. 377, 380, 13 Am. Rep. 537, it was said one of the tests was whether the property could be "removed without practically destroying it or where it is essential to the support of that to which it is attached." In McRae v. Central National Bank of Troy, 66 N. Y. 489, there was erected upon the land a building specially adapted for a twine factory, and for the purpose of holding the machine used in the business of manufacturing twine, which, being very heavy, required extra strength in the building. Each machine was fastened to the floor by bolts, nails, or cleats, and was attached to the gearing. Most of the machines could be removed without material injury to them or to the building, and could be used in any other building having strength to support and power to run them, but would be of less value if taken out and sold then if they remained as part of the factory. It was held that the machines became by annexation a part of the freehold. This same case points out this further consideration,

which has a very controlling influence in the determination of questions of this kind, and that is whether the article is attached for temporary use, with the intention of removing it, or it is affixed with the purpose of remaining. In Potter v. Cromwell, 40 N. Y. 287, 100 Am. Dec. 485, the rule is laid down that, where machinery is actually annexed to the land, it will be presumed to have been so attached with a view to the permanent improvement or beneficial enjoyment of the freehold, and will be deemed a fixture and part of the realty in the absence of proof that the attachment was merely for the purpose of steadying and adjusting the machine, or that the intention at the time existed, not afterwards abandoned, that the annexation should not be permanent in its character, or that there is some agreement or relation of the parties inconsistent with the supposition that a permanent annexation was intended. In that case the rule was applied to a "portable gristmill" for grinding flour, placed in a building and bolted to the floor for the purpose of being used as a permanent structure, for a custom gristmill for the neighborhood, and it was held it became a part of the realty. Mr. Justice Daniels in that case recognized with approval these criterions as aids in determining whether a piece of machinery becomes a part of the realty or not: First, actual annexation to the realty or something appurtenant thereto; second, application to the use or purpose to which that part of the realty with which it is connected is appropriated; third, the intention of the party making the annexation to make a permanent accession to the freehold. This is followed in Vorhees v. McGinnis, 48 N. Y. 278. When a building is erected for or permanently devoted to a particular purpose, anything annexed to the building for the carrying out of that purpose may be considered as accessory to the realty itself. 13 Amer. & Eng. Encyc. of Law (2d Ed.) p. 613. In 19 Cyc. p. 1045, it is said: "In some jurisdictions, if the realty is equipped with a complicated plant, some of which is so attached to the realty as to be a part thereof and some not physically annexed, then on a transfer of the realty the entire plant is transferred, including the unattached parts on the principle whereby an indispensable part of the machine is transferred." In some cases emphasis is laid also upon the fact that the part when removed from its attachment to the realty is of comparatively little value by itself. Matter of the City of New York, 101 App. Div. 527, 92 N. Y. Supp. 8, affirmed in 182 N. Y. 282, 74 N. E. 840. Applying, then, these well-recognized tests to the case in hand, we are constrained to hold that the power company under the provisions of the sixteenth clause of the agreement with the process company is entitled, not only to claim the brick which went into the construction of the building, but also such fixtures or attachments as were built into and constituted a part of the plant. In other words, such as went into its construction. The plant was especially erected for and devoted to the particular purpose of manufacturing caustic soda and bleaching powder by a peculiar process. The plant could be utilized for no other purpose. The buildings themselves standing alone without the fixtures and appliances put in them for the manufacture of these

articles would have been of comparatively little value, as they were located and designed for this business and were not adapted to the conduct of another business. The various fixtures installed in the buildings were specially designed for that particular business and particular process and each part formed a necessary constituent of an organized whole. The plant operated as a unit, and no part could be taken out without destroying the usefulness and efficiency of all the other parts. Practically all these parts were securely affixed or annexed to the realty by fastenings of various kinds built into it. If detached from the freehold they would have been of comparatively little value save as scrap or old junk. In addition to these considerations, there was no provision in the lease or agreement permitting their removal where the lease was terminated prior to November 15, 1909. The right to remove at all was only after November, 1909, and then only on payment of all rent due. As was said in the case of People ex rel. International Navigation Co. v. Barker, 153 N. Y. 100, 47 N. E. 47:

"When structures are erected by persons not owners of the land, they become part of the realty, and as such the property of the landowner. It requires an agreement to be expressed in order to prevent the operation of the rule."

In no event was any of the machinery to be removed even after November, 1909, unless all rent was paid. We are of the opinion, therefore, that under the provisions of the lease and the law in relation to fixtures that the process company and its trustee in bankruptcy had no right to remove any of the buildings or fixtures therein, and that the fixtures to the building constituting the plant all properly are described as "buildings" within the meaning of the sixteenth clause of the agreement.

Defendant contends that, inasmuch as there had been a severance of the annexation of some of these things by the effects and operation of the fire which was most disastrous, as to those things, the right of the power company to retain them was lost. In this view we cannot concur. We can discover no principle in law or equity which prevents the power company following what remained after the fire in so far as it can be identified as a part of the original erections.

The defendant also contends there never has been any legal termination of the lease because it is claimed the plaintiff failed to take the steps necessary to put an end to the term and thereby acquire the lessee's property. It is claimed that it presents a case of forfeiture, and that in order to forfeit the tenant's rights for the nonpayment of rent there must be (1) a demand of the rent precisely on the day when the rent is due and payable; (2) that the demand must be made at a convenient time before sunset; (3) and made upon premises. The provision for the termination of the lease is, however, a conditional limitation, and not a forfeiture. In re Guaranty Bldg. Co., 52 App. Div. 140, 64 N. Y. Supp. 1056; Martin v. Crosley, 46 Misc. 254, 91 N. Y. Supp. 712; Cottle v. Sullivan, 8 Misc. Rep. 184; Ronginsky v. Grantz, 39 Misc. Rep. 347, 79 N. Y. Supp. 839.

For the foregoing reasons, the trial court finds the plaintiff is entitled to recover. Let findings be prepared in accordance with the views expressed in this opinion. So ordered.