William C. Hecht, Jr., J.
This is a proceeding in eminent domain brought by the City of New York to acquire title to the real property required for the Lincoln Square Slum Clearance Project within the area bounded by West 60th Street, Amsterdam Avenue, West 66th Street, lands of New York Central Railroad, West 70th Street, Amsterdam Avenue, West 66th Street and Columbus Avenue, excluding all streets, in the Borough of Manhattan, City of New York.
The trial extended over a period of several months. In compliance with the statutory requirement, the court viewed the properties on several occasions.
After considering all the evidence and after due deliberation, the court fixes awards as follows:

Damage Parcel Land Improvements Total

100-101-102 $40,000 $28,000 $68,000
*192 Awards for fixtures and machinery are as follows:
[Damage parcels, claimants’ names, and amounts of awards are not printed.]

Damage Parcel 462:

I find the land value of this damage parcel to be $156,090. I arrived at this figure by adopting a unit lot value of $15,000 for 8.6 unit lots and by allowing 10% for plottage and 10% for double frontage.
The improvement consists of two buildings, with a substantial amount of machinery and equipment therein. These were used as an ice manufacturing plant by American Ice Company, whose predecessor in title had constructed the buildings for that purpose and had installed the machinery and equipment.
The city argues that the usual appraisal standards do not apply here, because the manufacture of ice is a “ dying industry ”, and the plant is far in excess of what can be usefully employed for that purpose under present conditions. The credible evidence lends no support to this contention, but on the contrary conclusively establishes that at the date of taking this plant was an efficiently functioning unit, usefully employed in the manufacture of ice.
The plant was ideally located to serve the many theatres which use block ice for air-conditioning; the hotels, restaurants and night clubs, and the steamships, all of which furnish a large market for cubed ice and crushed ice. The testimony satisfies me that the 660-ton daily capacity of the plant was appropriate in view of the seasonal nature of the business, since that capacity was exceeded on many days of peak demand. It may be added that even if the plant were not being used to full capacity, but were used solely as a reserve, it would have to be valued as a going plant (Matter of Mayor, 39 App. Div. 589, 590-592 [1st Dept.]).
Since the character of the structures was well adapted to the land, and since earning capacity is not applicable in view of . their specialized nature, the measure of the value which they added to the land is the 1 ‘ testimony of structural value, which is but another name for cost of reproduction, after making proper deduction for wear and tear ” (Matter of City of New York [Blackwell’s Is. Bridge], 198 N. Y. 84, 86-88, 90; Glen v. Mohawk Milk Assn. v. State of New York, 2 A D 2d 95, 96-97 [3d Dept.]).
On this item, I find the testimony of the city’s expert Sharman to be more credible than that of the claimant’s expert Kennedy. Accordingly, I find the replacement value of the *193 buildings to be $786,286; the depreciation to be $373,486; and the sound value on date of taking to be $412,800.
Sharman’s allowance of 47%% for depreciation, based on the 38-year age and an anticipated 80-year life for the buildings, is more realistic than Kennedy’s allowance of 25%. The latter justified his figure by the excellent maintenance. But it is only because of such maintenance that the buildings can be assigned an 80-year life. Even with that maintenance, physical wear and tear, to say nothing of technological changes in construction, would make these buildings unsuitable for such heavy manufacture in 80 years, rather than in the 150 years estimated by Kennedy.
For the reasons discussed above, the city’s claimed deduction of the sound value of the third floor, based on the “ dying industry ” theory, is rejected.
On the claim for machinery and equipment:
1. Claimant conceded its omission to inventory Items 64, 65, 67 and 68, and numerous small articles in Item 62. I hold that Items 63 and 66 are not properly identified in the inventory. All of these items will therefore be disallowed.
2. Since the date of the inventory, claimant removed the 1200 G-PM pump which is part of Item 23; all except the two wooden cube bins and an ice cake hoisting machine in Item 51; and a turret lathe, a power saw, and two drills in Item 59. All of these removed items will be disregarded.
3. The city concedes the material immovability of the two wooden cube bins in Item 51; and all of Items 3, 4, 5, 12, 32, 34, 37, 45-50, inclusive, and 55-58, inclusive. Therefore claimant’s right to an award for these items is not questioned. -
On reproduction cost of these items, I accept the testimony of claimant’s expert Sears in preference to that of the city’s expert Greene. Sears determined reproduction cost by ascertaining prices in effect on title vesting date from manufacturers and adding thereto the cost of carting, rigging, foundations, insurance and labor of installation. Then he superimposed successive charges of 10% for overhead, 10% for profit and 6% for engineer’s fee.
The 10% for overhead and the 10% for profit will be disallowed except as to items hereafter enumerated. As I understand Sears’ testimony, on these items he used the manufacturer’s quoted price, which would obviously include the manufacturer’s overhead and profit. The owner’s cost of delivery and installation is specifically added by Sears. However, contrary to the city’s contention, I believe that an engineer’s fee of 6% is proper to cover the cost of planning and *194 supervising the installation of such heavy and complicated equipment.
But on Items 4, 46, 48, 49, 50, 54, 55, 56, 57, 58 and 61 Sears’ surcharges of 10% for overhead and 10% for profit should be allowed. Here, as I understand Sears’ testimony, he ascertained the unit costs of the piping, etc., rather than the cost of the completed machine as in the other items. Here, too, the 6% engineer’s fee should be allowed.
The detailed valuation of each item based on the foregoing formula is set forth in Schedule A-l.
Sears allowed 35% for depreciation; Greene 50%. As Sears points out, the machinery was frequently overhauled and worn parts replaced so that the efficiency of the machinery was maintained. All the testimony in the case satisfies me that this machinery was efficiently performing its function of producing a large quantity of ice. Under the circumstances, I think that depreciation allowance of 40% is adequate. On this basis, the total value of the items in this category is $485,587. This includes an engineering fee of 6% on certain items hereinafter set forth.
4. As to the items in dispute, it is necessary to repeat the important distinction enunciated by Rumsey, J., in Matter of Mayor (39 App. Div. 589, supra) between items installed by a tenant which it intends to remove, and improvements put upon the land by the owner to enable him to better use his own land for the purposes for which he intended it, and who therefore intends the annexation to be permanent. He said (39 App. Div. 589, 593-595):.
The argument of the city is substantially that the city takes simply the land, and that whatever is put upon the land for purposes of trade or business, although put there by the owner and not by a tenant, is not to be regarded as a portion of the land to be taken, if it can be removed without such injury to the machinery itself as will practically result in its destruction for the use for which it was intended * * *.
There is practically no dispute upon the evidence that, as between vendor and vendee, a very large portion of this machinery would have been regarded as a fixture, and, therefore, if the premises had been sold by contract between two individuals the machinery would go with the land. Does this law of fixtures apply to this class of cases 1 In answering that question it is to be remembered that by the original rule of common law everything which was affixed to the freehold was considered to be a part of it. (2 Kent Comm. 343.) The law of fixtures was evolved out of a desire on the part of the courts to protect those who, having an estate less than a fee in the land, had made improvements upon it which, if they could not retain, would be lost to them, and in the effort to protect the interests of those persons there has grown up gradually a rule, in derogation of the common law, by which persons who put upon the land improvements would be permitted to retain them, unless they were so placed as that their removal would injure a portion of that which *195 necessarily belonged to the freehold. But where the improvements were put upon the land by the owner, and it was evident that they were so placed there to enable him to better use his own land for the purposes for which he intended it, there could have been on his part no intention to remove these improvements, and justice did not require that the common-law rule should be limited for his protection. For that reason it has always been held that, so far as the owner is concerned, the law of fixtures would be rigorously limited, and that whatever had been put upon the premises under such circumstances that it would become a part of the freehold, or essential for the purposes for which the freehold was used, would be, so far as the owner was concerned, regarded as a fixture as between him and any person to whom he proposed to transfer the land.
The same rule exists in proceedings to take land under the right of eminent domain, and the commissioners of estimate have no right to restrict the assessment to the simple value of the land, compelling the owner to retain the fixtures on the premises, and exempting the city from an obligation to take and pay for them as a part of the land. (Schuchardt v. Mayor, 53 N. Y. 202, 208.) Whatever has been put upon the land by the owner with the intention that it should remain upon the land and was essential to the use which he made of it, is, generally speaking, as between himself and his vendee, a fixture, and goes with the land when he shall sell it.
* * * So machinery which has been put in the building and is permanent in its character, and essential for the purposes for which the building is occupied, is to be regarded as realty. (O’Brien v. Kusterer, 27 Mich. 289.) When the value of the land is appraised, such appraisal must include whatever is a fixture and the elamiant must be paid for it. (Lewis Em. Dom. § 488.) This was evidently the rule adopted by the commissioners.
That rule applies here. All of the machinery and equipment in dispute (with the exception of Items 7, 9, 16, 41, 52, 53, 60 and 62) were put in the buildings by the owner with the intention that they should remain upon the land, and were essential to the use which the owner made of it. The necessary tests of permanence and adaptability having thus been met, it is not necessary to prove immovability, since we are dealing with an owner rather than a tenant.
I have applied Sears’ estimate of the reproduction cost of the disputed items in accordance with the principles already set forth. The engineer’s fee of 6% has been allowed, but the surcharges of 10% for overhead and 10% for profit have been disallowed, except on Items 19 and 54. This produces a value of $365,791 for these items.
The principle stated in Matter of Mayor (supra) had been imbedded in our law of real property long before it was applied in condemnation cases. It was reiterated in Matter of City of New York [Whitlock Ave.] (278 N. Y. 276), the case chiefly relied on by the city.
If the chattel cannot be removed without injury to itself or the realty, it becomes a fixture regardless of whether it was attached by the owner or the tenant. But even if it can be so *196 removed, if it has actually been annexed to the realty, the test becomes one of adaptability to the use of the freehold, and intention of the parties at the time of making the annexation.
Much greater proof of intention to malee a permanent annexation is required as against a tenant, or a chattel mortgagee, or a conditional vendor. But such intention is readily presumed in the case of an owner where (as here), he installs machinery in a building which is especially suited for that purpose, and with the object of carrying on his business therein. Oorrelatively, a eondemnee satisfies the test by the same evidence as would be determinative against him as vendor, since 11 Condemnation is an enforced sale, and the 'State stands toward the owner as buyer toward seller ” (Jackson v. State of New York, 213 N. Y. 34, 35, Cardozo, J.; see, to the same effect, Matter of Mayor, supra; Matter of Post Office Site in Borough of Bronx, 210 F. 832, 834).
Since this problem of machinery recurs in other damage parcels in this slum clearance project, it will be helpful to review the history of the doctrine, and its subsequent application to condemnation.
The first comprehensive discussion appears in the opinion of Justice Co wen for the Supreme Court of Judicature in Walker v. Sherman (20 Wend. 636 [1839]). “ This case holds, in respect to machinery, that the two characteristics of adaptation to the enjoyment of the realty and annexation to it must concur; but that where the former characteristic is present, the slightest fastening will be sufficient to constitute annexation ”.(McRea v. Central Nat. Bank of Troy, 66 N. Y. 489, 498).
The problem came before the Court of Appeals in 1858, in Murdock v. Gifford (18 N. Y. 28). There the owner had fastened looms to the floor merely for the purpose of keeping them in their places and in a steady position during their operation. They were worked by a band carried by the fixed machinery. Any one of them could be separately disconnected with the motive power, and they could be easily and conveniently removed without injury to themselves or to the realty.
The court held that these looms passed to a judgment creditor of the owner, rather than to a mortgagee of the realty. Chief Judge Johnson said that in “ the casé of a factory, the wheel or engine which furnishes the motive power, and all that part of the gearing and machinery which has special relation to the buildmg with which it is connected, would belong to the freehold; while an independent machine like a loom, which, if removed, still remains a loom, and can be used as such wherever it is wanted and power can be applied to it, will still retain its *197 character of personalty ” (p. 34, italics supplied). The test of adaptability was thus recognized at that early date; the other test of intention of permanence was enunciated one year later in Ford v. Cobb (20 N. Y. 344).
That case involved salt kettles which were set in arches upon a block in the salt works. It was the general custom to take the kettles from the arch and to reset them every season. The court held that they belonged to the vendor of the kettles who had taken a purchase-money chattel mortgage, rather than to a subsequent vendee of the salt works.
Judge Demo assumed that if the owner had purchased the kettles outright, ‘ ‘ the manner in which he annexed them to the freehold was such as would have converted them into a parcel of the realty; and that they would have passed to his subsequent grantee of the land ” (p. 346). However, “ The agreement contained in the chattel mortgage preserved their character as personalty, which would otherwise have been lost by their annexation ” (p. 352).
This presumption that, since the owner had given a chattel mortgage on the machinery, he did not intend it to become permanently affixed to the realty, explains the subsequent decisions of Tifft v. Horton (53 N. Y. 377); Sisson v. Hibbard (75 N. Y. 542); and Madfes v. Beverly Development Corp. (251 N. Y. 12).
Tifft v. Horton {supra) involved an. engine, boiler, and other machinery. They were not put in the owner’s grain elevator, but on a foundation made for them outside of the building, and an engine house was built over them after they were set up. In holding for the chattel mortgagee in preference to the realty mortgagee, the court said, per Folger, J. (p. 380):
It is well settled that chattels may be annexed to the real estate and still retain their character as personal property. (See Voorhees v. McGinnis, 48 N. Y. 278, and cases there cited.) Of the various circumstances which may determine whether in any case this character is or is not retained, the intention with which they are annexed is one; and if the intention is, that they shall not by annexation become a part of the freehold, as a general rule they will not. 81 * * It may in this case be conceded, that if there were no fact in it but the placing upon the premises of the engine and boilers in the manner in which they were attached thereto, they would have become fixtures, and would pass as a part of the realty. But the agreement of the then owner of the land and the plaintiff is express, that they should be and remain personal property until the notes given therefor were paid.
In Sisson v. Hibbard (supra) the findings did not “ disclose such a permanent annexation of the machinery to the freehold as to preclude the owner of the land from making a valid agreement with the vendors of the machinery that it should continue, as between the parties, to be personal property, and that the *198 vendors should have a lien thereon for the price and the right to remove the same on default in payment ” (75 N. Y. 542, 545).
In Madfes v. Beverly Development Corp. (supra) gas ranges had the piping in each range attached by a simple coupling to the service pipe which delivered gas to the various apartments. In awarding them to the conditional vendor in preference to the realty mortgagee, the court stated that these ranges were included in “ a large class of movables which, after attachment, continued to be personal property, or became real estate, accordingly as the owner of the chattels and the owner of the real estate might have agreed ” (251 N. Y. 12, 15).
These cases have nothing to do with the case at bar nor with a number of other cases involved in this slum clearance project. Here no claim is made by a chattel mortgagee nor by a conditional vendor. As between vendor and vendee, when the vendor has annexed machinery to his building which is adaptable to the purpose for which the building is being used, and with the intention to make the annexation permanent, the machinery passes with the realty, despite the fact that it may be readily removed without damage to itself or to the realty.
In Potter v. Cromwell (40 N. Y. 287) decided in 1869, the owner put a portable gristmill into his building. This gristmill “ was built at a factory, ready for use, and was made in such a manner, as to be readily taken apart without injuring it, and moved from one place and set up in another.” In fact, it had been previously used in another mill, from which it was taken to the instant building; and was subsequently removed from this building by taking it apart, without being injured or injuring the building. The test of immovability was clearly not satisfied. However, the Referee found that the owner had designed the mill “ as a permanent structure for use as a custom and gristmill for that neighborhood ” (pp. 291-292).
The court held that this gristmill became a part of the realty, and therefore passed to the vendee, and could not be attached by a judgment creditor of the vendor. The court said, per Daniels, J. (p. 292):
The mill clearly appears to have been very firmly and securely attached to the building by means of the rods passing through the timbers of the frame, and those placed upon it upon the floor; the joists upon which that rested and the timbers under the joists, and the nuts and washers on the lower ends of the rods. It was attached in this manner, not for the purpose of steadying it and keeping it in its place, as the looms were shown to have been, in the case of Murdock v. Gifford (18 N. Y. 28), but for the purpose of being used as a permanent structure, for a custom and grist-mill for the neighborhood. In this respect, therefore, there is an essential difference between the circumstances upon which it was then decided, that the looms were not so attached *199 to the building as to become a part of the realty, and those presented by the present case. * * * The ease, by construction, expressly negatived the idea that the looms were attached to the building for the purpose of rendering them a part of it. No such intention could have existed, as they were attached to keep them steady and in their places, and not otherwise. (Italics supplied.)
Having thus reiterated the test of intention of permanence, the court concluded:
that the true criterion of a fixture is the united application of three requisites: First. Actual annexation to the realty, or something appurtenant thereto. Second. Application to the use or purpose to which that part of the realty with which it is connected is appropriated. Third. The intention of the party making the annexation, to make a permanent accession to the freehold (pp. 296-297).
In Voorhees v. McGinnis (48 N. Y. 278) decided in 1872, one Kimmey had erected a building in which he installed a steam engine, boilers, shafting and gearing. The engine and boilers were bolted into solid block foundations, which were laid in mortar and built in a permanent and substantial manner. But all of this machinery was capable of being removed without injury to the building, except that the removal of the boilers involved the displacement of hricks in a chimney above them. Nevertheless, the court held that these items passed to the mortgagee of the realty, rather than to the chattel mortgagee of the machinery. The reason was “ that they were actually and permanently annexed to the freehold, adapted to use in that position, and intended to be a permanent accession to the freehold. Kimmey, who was the owner and erected them, had no intention of removing them at any future time ” (p. 286). The court said, per Hunt, J. (pp. 282-283):
The circumstance that the machinery may or may not be removed without great injury to the building or to itself, is not now deemed to be controlling. In Potter v. Cromwell [40 N. Y. 287] (supra) the tests are declared to be, first, actual annexation; second, the use or purpose of the application of the machinery; third, the intention to make the annexation a permanent accession to the freehold. In Washburn on Real Property (Vol. 1, p. 7), the rule is thus laid down, as between vendor and vendee, and mortgagor and mortgagee: “If the owner of lands provides anything of a permanent nature, fitted for and actually applied to use upon the premises by annexing the same, it becomes a part of the realty, though it might be removed without injury to the premises.” (Italics supplied.)
In McRea v. Central Nat. Bank of Troy (66 N. Y. 489) decided in 1876, the court held that the machinery belonged to the mortgagee of the realty, in preference to a judgment creditor of the owner. The court said, per Rapallo, J. (p. 494):
The court found as facts that the articles of machinery described in the complaint were fixtures and part of the freehold, and as facts showing that they were fixtures: First, that the building in which the machinery was, was *200 erected for the purpose of a twine factory, and the machinery specially adapted to it and used with it; second, that the original intention of this annexation was to make this machinery permanently a part of the building and the freehold; and, third, that the mortgage under which the plaintiff claims title was to secure to him the payment of the purchase-money of the premises described therein, and was taken by him and given to him with the intention of holding the machinery in question as part of the realty, and not as personal property.
After describing the findings indicating that the machinery could be removed without damage to itself or to the realty, the court said (pp. 495, 497):
On these findings, assuming them to be sustained by evidence, I think it clear on all the authorities cited, that the conclusion that, as between the present parties, the machines were fixtures and part of the freehold was correct. 9 * as between vendor and vendee, the mode of annexation is not the controlling test. The purpose of the annexation, and the intent with which it was made, is in such cases the most important consideration. The permanency of the attachment does not depend so much upon the degree of physical force with which the thing is attached as upon the motive and intention of the party in attaching it. If the article is attached for temporary use with the intention of removing it, a mortgagee cannot interfere with its removal by the mortgagor. If it is placed there for the permanent improvement of the freehold he may.
• • •
The case of Murdock v. Gifford (18 N. Y. 28), which is mainly relied upon by the appellant here, was distinguished by showing that, in that case, not only was there an entire absence of any finding that the looms were placed in the building and attached thereto for the purpose of becoming a permanent part of it, but that that fact was expressly negatived by the finding that the attachment was for the sole purpose of keeping them steady in their places —• a fact which the court, in the present case, although requested expressly, refused to find. Numerous other eases are referred to, where, notwithstanding similar attachments, the property was held to be personalty; but it appears that in all these eases the object of the attachment excluded the intention of rendering them permanent fixtures. The object, and not the method of the attachment, appears to be considered the controlling feature (italics supplied).
This rule regarding title to machinery as between vendor and vendee was carried over into condemnation awards in Matter of Mayor (39 App. Div. 589, supra); in Phipps v. State of New York (69 Misc. 295, containing a particularly illuminating discussion by Rodekbeck, J.); and in Matter of City of New York (North Riv. Water Front) (118 App. Div. 865, 1st Dept., affd. 189 N. Y. 508).
In the last-named case, a tenant under a long-term lease had constructed a building on the property. The machinery was built into the building, or constructed upon foundations built into the ground, and connected with a shafting which in turn connected to either steam or water pipes. The machinery was appropriate and proper for the uses to which the building was put by the tenant, but it could be removed without serious injury *201 to itself or to the freehold. The court affirmed an award for this machinery, saying, per Ingraham, J. (pp. 866-867):
I think on the condemnation of property the owners of the buildings and leasehold are entitled to be paid the fair market value of the buildings as they exist, together with such permanent machinery as has been built into the buildings and used in connection with the leasehold estate for business purposes. B * * This machinery was used in connection with the building which belonged to the tenant. It would be manifestly unjust to treat such property as personal property when its value after it was severed from the building would be a very small percentage of its value as a part of the building for the use of the tenants in the business which they were conducting. Assuming that if the landlord elected to purchase the building under the provisions of the lease, it would not be required to pay for such property and the tenant would be required to remove it, when the city condemns the property it takes from the tenant the building of which this machinery is a part, and it is only just that the tenant should he paid what the building as a whole is worth.
The city leans heavily on Matter of City of New York (Whit-lock Ave.) (278 N. Y. 276). That case involved machinery claims by two tenants. One had installed looms similar to those in Murdock v. Gifford (18 N. Y. 28, supra). In holding that these were not compensable, the court said, per Finch, J. (pp. 281-282):
The mere fact that the articles involved herein are attached to the floor does not render them fixtures. (McRea v. Central Nat. Bank, 66 N. Y. 489, 495.) Machinery normally is personal property and is not deemed a fixture except where it is installed in such manner that its removal will result in material injury to it or the realty, or where the building in which it is placed was specially designed to house it, or where there is other evidence that its installation was of a permanent nature. In the absence of such proof the machinery does not become a fixture and a part of the realty, but remains personal property and is removable by the person who installed it. There is no such evidence of permanent installation concerning the looms involved in the case at bar. They were affixed to the floor merely for the purpose of maintaining their stability, and they were readily removable. There is no reason why such looms or the harness or the other parts used in connection with them should be held to be a part of the realty. In Murdock v. Gifford (18 N. Y. 28), substantially similar looms, although attached to the building, were held to be personal property. (Italics supplied.)
The same conclusion was reached regarding the other tenant (p. 283):
The claimant’s inventory and appraisal of these articles includes many items which were not attached to the realty, such as steel lockers, cabinets, trucks, racks, tables, sewing machines, and the like. Included also are many items which were bolted to the floor merely to maintain their stability, such as ironers, sorting tables, washers, extractors and similar machinery. Although some of these machines had steam and water connections, they could be readily removed by disconnecting the unions which were attached to the piping. Concerning these items there can he no doubt that they did not constitute fixtures.
The question is more difficult when we consider the substantial machinery. There is evidence, however, that much of this, despite its size and weight, was *202 readily removable and was not installed in a permanent manner. Most, if not all, of this machinery, had been removed from the claimant’s earlier place of business. Only such machinery as cannot be removed without injury to it or the freehold, or concerning which there may be other evidence of an installation of a permanent nature, should be held to constitute fixtures. (Italics supplied.)
The italicized portions in the foregoing extracts indicate that Whitlock Avenue has not deviated from the established rule that annexation, adaptability, and intention of permanence convert machinery into a fixture, regardless of removability. It was because adaptability and intention, which were proved here, were not proved by the two tenants in Whitlock Avenue, that their claims were disallowed. The same is true of Matter of City of New York (Triborough Bridge) (249 App. Div. 579, 581, 582-583 [1st Dept.]) and in Matter of City of New York (Woolhiser) (250 App. Div. 197 [2d Dept.]). In the latter case, the court affirmed an award of compensation for presses and machines which were fixed in position by screws and bolts and operated by specially built power circuits, and were used by a tenant in his printing business. An examination of the record on appeal shows that the items which were disallowed did not fall within the test already discussed. They consisted of filing cabinets, tables, fonts of type, cases, galleys and type setting sticks, and lighting outlets, and aggregated only about 20% of the tenant’s claim.
In Matter of People v. Johnson & Co. (219 App. Div. 285 [1st Dept], affd. 245 N. Y. 627, cert, denied 275 U. S. 571) the award was made up of specific allowances for land, buildings, fixtures, certain additional material, and auxiliary equipment. The commissioners did not make any award for items of personal property, but Special Term added damages representing the difference between the value of this property in a going-plant and their salvage value. This was reversed because no damages could be allowed for personal property that had not become a fixture (pp. 288-289).
The final question is the proper method of determining the value of the machinery. In Jackson v. State of New York (213 N. Y. 34) the court said, per Cardozo, J. (pp. 35-36):
Condemnation is an enforced sale, and the State stands toward the owner as buyer toward seller. On that basis the rights and duties of each .must be determined. It is intolerable that the State, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery, and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value.
*203 The same rule was expressed in Queensboro Farm Prods. v. State of New York (5 N Y 2d 977, see, also, opinion below, 6 Misc 2d 445, 449); and in Glen & Mohawk Milk Assn. v. State of New York (2 A D 2d 95, 96-97 [3d Dept.]).
That rule has been adhered to here. The award does not proceed on the basis of the value of secondhand articles. It allows full reproduction cost less depreciation, and adds the cost of carting, rigging, foundations, insurance, and the labor or installation, plus an engineering charge of 6%. I do not believe a buyer would pay more than this for machinery in a going plant.
Claimant urges that Banner Milling Co. v. State of New York (240 N. Y. 533) justifies an additional award for “ going value ” of the building and machinery. In that case the court said, per Crane, J. (pp. 543-544):
In establishing the value of the flour mill property appropriated, it was competent to prove all the uses that could be made of the property; the value of the plant as a live, going flour mill, the increased value, if any, which the structure so used had given to the land, and all the valuable appurtenances and availabilities of the property. To estimate the fair market value the court no doubt should have considered not only the cost of production, but also the cost necessarily or reasonably expended in bringing the mill or factory into efficient working condition, what has been called the synchronizing of its parts. Architect’s fees in making or revising plans, compensation for engineers to carry out the plans or to arrange the factory so as to produce appropriate manufacturing results are all elements which should be considered in estimating the market value. These are things which a seller and a purchaser would consider on a sale. This does not mean, however, that the cost of these various items considered alone and by themselves must be allowed for or that the sum total of all these expenses make up the owner’s compensation. The cost of production or of reproduction need not of necessity be taken part by part, and the total accepted as the amount of the award. These items like other items of cost in production or reproduction are to be considered and weighed with the other evidence of value.
This I understand was the rule applied by the Court of Claims in this case. * 9 * The opinion stated: “ The claimant is entitled to recover the value of its physical property as it existed at the time of the appropriation. That does not mean that its value is to be arrived at by taking the value of the various elements and items making up the property separately, and considering them without reference to each other, and then adding together these sums. The claimant is entitled to compensation, not merely for so much land, só much brick, lumber, materials and machinery considered separately, but if they have been combined, adjusted, synchronized and perfected into an efficient functioning unit of property, then it must be paid for that unit, so combined, adjusted, synchronized and perfected, as it existed at the moment of appropriation. In that limited sense, it is entitled to the ‘ going value ’ — if such a term is permissible — of its physical property. In fixing the amount of award we will be guided by that principle.”
After making the foregoing exposition of the law, the court affirmed the finding of fact and conclusion of law of the Oourt *204 of Claims. Its finding No. 32 was that “ [t]he fair value of architects’ and engineers’ fees upon the construction and equipment of said plant, insurance premiums and interest on investment during construction period, railway franchises, legal expenses, sundry items correcting errors in construction, éxpenses incurred in operating mill at a loss up to the time when machinery is synchronized and co-ordinated so as to produce satisfactory results is the sum of $75,000 ”, but the court refused to find that claimant was entitled to recover from the State any part of this $75,000.
I believe that the foregoing awards of $412,800 for the building and of $851,378 for the machinery give full consideration to whatever “ going value ” was proved to exist in this plant. In the Banner Milling case (240 N. Y. 533, supra), the proof established that the business had produced for the claimant average earnings of over $50,000 annually. In the case at bar, claimant offered no competent proof of earnings, so that the only test of value is reproduction cost, less depreciation. The testimony of claimant’s witness Brizzolara was that the reproduction cost of a going ice plant is $4,500 per ton of capacity. Allowing depreciation factor of 35%, he arrived at a net value of $3,000 per ton. Applying this to the 660-ton capacity of this plant he estimated a “ going concern ” value of $1,980,000 compared with the foregoing value of $1,264,178 found by me for the building and machinery.
I do not believe that this type of generalized testimony discharges the burden of proof required by the Banner Milling case, wherein, it may be noted, the decision went against the claimant.

Schedule A-l.

Items Concededly Compensable.

Item No.

3 Freezing tanks (including can, grids in Item No. 8) $110,000
4 Brine cooling coils............................. 167,254
5 Brine coolers ................................. 17,986
12 Dip tanks.................................... 4,874
32 Chemical apportioner.......................... 3,352
34 «Sedimentation tank ........................... 6,000
37 Fore cooler................................... 7,907
45 Tank room conveyors.......................... 25,694
46 Spiral downtakes ............................. 38,115
47 Anteroom conveyors........................... 8,274
48 Insolation.................................... 134,334
49 Anteroom coils ............................... 16,005
50 Storehouse coils .............................. 18,424
51 Two wooden cube bins.......................... 901

*205
Schedule A-l.

Items Goncededly Compensable.

Item No. Continued

55 Ammonia piping.................................... $105,920
56 Electric; power lines, conduit and wiring............... 28,202
57- Air piping......................................... 30,963
58 Water piping....................................... 39,296
$763,501
Engineer’s fee, 6%.................................. 45,810
$809,311
40% depreciation................................... 323,724
$485,587

Schedule A-2.

Disputed Items Found Compensable.

Item No.

1 Ammonia compressors and synchronous motors......... $199,398
2 Exciters ........................................... 12,140
6 Agitators .......................................... 7,280
10 Cranes ............................................ 69>608
11 Dump tables ....................................... 7,588
13 Blowers ............ 9,220
14 Core pumps........................................ 2,537
15 Accumulators ....................... 4,372
17 Liquid pump ........................... 1,935
18 Transformers ......... 33,601
19 Switchboard ....................................... 42,495
20 Panel boxes........................................ 7,144
21 Ammonia condensers ................................ 23,181
22 Cooling tower ...................................... 73,500
23 Circulating pumps (auxiliary pump removed).......... 8,914
24 Ammonia receivers.................................. 2,914
25 Oil separators...................................... 744
26 Distillers........................................... 1,569
27 Purger ............................................ 304
28 Precooler .......................................... 4,186
29 Liquid cooler....................................... 1,144
30 Dip water reclaimers................................. 2,975
31 One water meter..................................... 561
33 Chemical tanks .................................... 1,125
35 Water filters ............ 4,962
36 Filter pumps....................................... 1,998
38 Fore cooler circulating pump......................... 668
39 Can fillers ......................................... 16,144
40 Heating boiler...................................... 10,168
42 Ventilating fans .................................... 3,831
43 Sump pumps....................................... 808
44 Ammonia pressure switches........................... 10,520
51 Ice cube hoisting machine............................ 1,004
54 Engine room....................................... 1,478

*206
Schedule A-2.

Disputed Items Found Compensable.

Item No. Continued

59 Machine shop (balance).............................. $2,600
61 Storeroom ......................................... 2,527
$575,143
Engineer’s fee, 6%................................... 34,509
$609,652
Depreciation, 40% .................................. 243,861
$365,791
485,587

Schedule A-3.

Total $851,378

Items Found Not Compensable.

Item No.

7 7,282 ice cans
9 Tank covers
16 Ammeters
41 Heat units
52 Pump room
53 Roof (ice cans)
60 Air compressor
62 Metal lockers — fire extinguishers, etc.
Let the Corporation Counsel prepare and submit a partial tentative decree accordingly.