In the Matter of the City of NEW YORK, Relative to Acquiring Title to Real Property Required for a Project Known as Bellevue South Urban Renewal, Within the Area Bounded by 1st Avenue and Other Streets.

Supreme Court, Special Term, New York County, November 1, 1966.

*Samuel Goldstein & Sons* (*Samuel Goldstein* of counsel), for claimant. *J. Lee Rankin, Corporation Counsel* (*Moe Lando* of counsel), for City of New York.

4

JOSEPH A. SARAFITE, J. This is a proceeding in eminent domain brought by the City of New York to acquire title to real property for a project known as Bellevue South Urban Renewal (Project No. NY R-18) within the Borough of Manhattan, City of New York.

The claimant, City Textile Printing Corporation, is the fee owner of Damage Parcel No. 133 and has filed claims for the fee and also for fixtures and machinery. The court has heretofore made an award for the fee (N. Y. L. J., June 29, 1966, p. 10, col. 5). Both the claimant and the city appraised the real estate on an economic basis — a rental value was adopted for the space occupied by the owner — and the court has made its award accordingly. What is now before the court is the claim for the fixtures and machinery used in the claimant's textile printing business. The owner's appraisal of value is $1,128,819.92 and the city's appraisal is $65,628, a ratio of almost 20 to 1.

There are six buildings on this plot fronting on two streets — three on 27th Street and three on 28th Street. At the time of the taking claimant occupied a substantial part of the 27th Street buildings, which are all interconnected; in particular, the basements, ground floor and the second floor. The third floor and parts of the 28th Street buildings were used for the storage of equipment belonging to the claimant.

Claimant — in business since 1940 at another location — purchased these buildings in 1947 and took occupancy in 1948. Part of the premises had been occupied by a brass foundry. In the preparation of the 27th Street building for use in the claimant's business, substantial reconstruction of floors was undertaken, for the purpose of installing and preparing for efficient use six huge printing units. In particular, claimant reconstructed the concrete floor on the ground level, removed the piping and electrical work, replastered the walls and ceilings, rebuilt the north wall and installed new windows and doorways and lavatories, erected a "color shop" and removed "I" beams "left hanging from the ceiling". In addition, claimant erected four single "dry towers," measuring 12½ feet by 19 feet, and one double, 26 feet by 19 feet. These are integral parts of six printing units which were later installed. This work necessitated sinking five steel columns into the floor. They extend upwards through the roof of the one-story extension and support the structural steel frame above the roof upon which rests the concrete floor of the dry towers. Claimant also rebuilt the boiler room and the high pressure steam boilers in the premises; cut an opening in the grade floor so that goods could be lowered

to and lifted from the basement to permit them to be carried to the washing unit for processing, and laid new concrete flooring near the washing unit. It is claimed by the owner that it took six to eight months to set up the first two of the six printing units. Each unit is approximately 22 feet long and 8 feet wide extending from floor to ceiling, and weighs approximately 44 tons. Each is built into a steel frame extending from floor to ceiling "and bolted throughout to the concrete floor and bolted to and welded into the building steel". Twenty-six openings were cut in the roof in varying sizes — some as large as seven feet across — over the printing machines.

It is on the basis of the aforesaid changes that the claimant contends that the building was " specifically designed to house the various installations necessary in the operation of a textile printing unit," and as altered, was used for installing such machinery as was necessary to promote the efficient operation of the business.

It is argued that it was Textile's purpose and intent to make the installation of the machinery permanent and that in this case, since Textile was the owner, such an intent is to be presumed. The claimant, however, does not rely on the presumption exclusively, and points also to the nature of the reconstruction of the building and the type, size and weight of the equipment as evidence of an intent to make these installations permanent improvements.

In sum, claimant contends that by reason of such intent and the adaptability of the fixtures for the use intended and the fact that upon severance from the realty the items would lose " part of their value in place and in operation ", all of the items in dispute are compensable trade fixtures.

Further, not only does the claimant argue that its machines are compensable by reason of the foregoing, but also that " each and every part of the plant and every item contained therein is necessary and indispensable to the operation of these printing units." Consequently, it is contended that virtually the entire contents of the plant constitute " one single printing system " which functions as an " integrated operation ", all of which is compensable. The court does not agree with this contention.

The most important item in this branch of the claim involves certain copper and steel rollers bearing various engraved patterns. They are used to impress and print on the fabric the designs cut into the rollers. To have all six printing units operating at one time requires 37 of these rollers. The claimant has approximately 2,300 such rollers stored in racks at the

premises — most of them bearing patterns no longer in fashion — alleged to be valued (after depreciation) at $469,401. The claimant contends that without these rollers " there is no printing machine at all " and consequently seeks compensation for them in the amount alleged.

The city contends, on the other hand, that most of the items in issue — and certainly the rollers — are not compensable because they are not attached to the realty. In addition, it claims that the machinery that was fastened to the building was done so merely to " furnish rigidity " and " alignment " rather than to make a permanent addition to the realty. The city also cites the fact that the claimant purchased the machinery as secondhand equipment and moved its component parts to this present location, as buttressing its position that there was a " lack of intention to make a permanent addition to the freehold." Moreover, it argues that since the claimant admitted that many of the machines had been replaced several times with other secondhand machinery, this demonstrated an intention to make " expedient installation " rather than a permanent annexation to the realty. Hence, the city concludes, that unique quality that distinguishes real property from personal property, to wit, its fixed, permanent and unmovable character, is absent under these facts.

Turning now to the law, the question of whether articles attached to real property are considered themselves real property as distinguished from personal property depends upon a number of factors. As was said by LEHMAN, J., in *Matter of City of New York (Allen St.)* (256 N. Y. 236, 244–245): " Question as to the ownership of, or succession to, structures or fixtures annexed to the land has arisen in many forms between landlord and tenant, vendor and vendee, heirs and personal representatives * * *. In each case the underlying question may be formulated: Do the structures or fixtures constitute real or personal property between rival claimants of title? Varying factors have dictated the answers given by the courts when called upon to decide the question between rival claimants of title. What may constitute personal property where the contest is between landlord and tenant may be real property where the claimants stand in other relation."

When the dispute arises between condemnor and condemnee the " Condemnation is [considered] an enforced sale, and the State stands toward the owner as buyer toward seller. On that basis the rights and duties of each must be determined " (*Jackson* v. *State of New York,* 213 N. Y. 34, 35, CARDOZO, J.).

Numerous decisions beginning with *Teaff* v. *Hewitt* (1 Ohio St. 511 [1853]) have established three requisites as aids to the court in determining the nature of the property in question: 1) actual annexation to the realty; 2) adaptability, i.e., the purpose for which the property was attached, and 3) the reasonable intention of the annexor at the time of the annexation to make a permanent accession to the freehold. (See, also, *Potter* v. *Cromwell*, 40 N. Y. 287 [1869]; *Voorhees* v. *McGinnis*, 48 N. Y. 278 [1872]; *McRea* v. *Central Nat. Bank of Troy*, 66 N. Y. 489 [1876]; *Phipps* v. *State of New York*, 69 Misc. 295 [1910]; *Matter of City of New York* [*Lincoln Sq. Slum Clearance*], 24 Misc 2d 190 [1959], affd. and mod. on other grounds 15 A D 2d 153, affd. 12 N Y 2d 1086; cf. *Matter of City of New York* [*Whitlock Ave.*], 278 N. Y. 276 [1938].) If "there is a unity of all these three elements, annexation, adaptability and intention, the law uniformly recognizes the property as part of the freehold" (*Phipps* v. *State of New York, supra,* p. 299). It follows then that "Mere intention to make an article personal a fixture, without annexation * * * will not make it one, but when such an intention does exist in the mind of the owner of the land and of the article, then the slightest affixing will make it part of the freehold. Such intention often becomes the controlling fact in determining * * * whether, in law, the article in dispute is or is not a fixture." (*Hart* v. *Sheldon,* 34 Hun 38, 42, 43.)

The case of *Whitlock Ave.* (*supra*) — upon which the city relies — is not to the contrary. As HECHT, J., stated in *Matter of City of New York* (*Lincoln Sq. Slum Clearance*) (*supra,* p. 202): "*Whitlock Avenue* has not deviated from the established rule that annexation, adaptability, and intention of permanence convert machinery into a fixture, regardless of removability," i.e., "despite the fact that it may be readily removed without damage to itself or to the realty" (*id.,* p. 198). In *Whitlock,* the court held that machinery normally is considered personal property except where "it is installed in such manner that its removal will result in material injury to it or the realty, or where the building in which it is placed was specially designed to house it, or where there is other evidence that its installation was of a permanent nature" (*Matter of City of New York* [*Whitlock Ave.*], *supra,* pp. 281–282).

Of these three exceptions in *Whitlock,* the city urges that Textile's claim that the fixtures are to be regarded as real property must rest "if at all, on the first exception, that is that the removal will result in material injury to it or the realty."

The city furthermore disputes claimant's contention that a presumption arises by reason of the fact that the installation was made by an owner rather than by a tenant.

Applying the foregoing rule of unity of all three elements to the facts of the case, the court has hereinafter set forth in two separate schedules those items that are deemed part of the real estate and therefore compensable and in one other for those items deemed not part of the real estate and are not compensable.

The unity rule is more easily stated than applied. To illustrate, the court will discuss only one of the largest items here involved, the printing " heads ". In the case at bar, there is a dispute as to whether or not these " heads " are fastened to the printing units. The " head " is the largest—approximately 40 tons — and, concededly the single most important component part of the printing unit. There is testimony by claimant's expert that the "heads " are bolted to the floor and set in concrete. The city's expert testified that he found no bolts from the printing " heads " to the ground except with respect to the sixth printing unit where it is bolted to the frame which in turn is bolted to the floor. The city submits that on this basis the " heads " are " free standing and therefore movable." The question for this court then is, if in fact the " heads " are not fastened, is this fact alone dispositive of the claim for compensation for these items? The answer appears to be that it is not. The method of attachment is some evidence bearing on the crucial question of the purpose for the attachment and the intent with which it was done. If, in fact, the court finds the units are attached to the freehold as a permanent part of the building, then the method of annexation of a component part thereof—whether by its own sheer weight or by bolts—is not determinative on the issue of compensation. " A thing may be as firmly affixed to the land by gravitation as by clamps or cement." (*Hart* v. *Sheldon,* 34 Hun 38, *supra*; see, also, *Snedeker* v. *Warring,* 12 N. Y. 174.)

Assuming annexation, the next issue is the intent with which it was done. Claimant urges that *Matter of the Mayor* (39 App. Div. 589) stands for the proposition that "intention of permanence is readily presumed " where the person who makes the installation is the owner himself who does so for the " better use of his property." Indeed, after stating the common-law rule that improvements placed upon the land remained with the land unless they could be removed without injury to the freehold, the court held (p. 595) : " But where the improvements were put upon the land by the owner, and it was evident that they were

so placed [*sic*] there to enable him to better use his own land for the purposes for which he intended it, there could have been on his part no intention to remove these improvements ''. More importantly, however, *Matter of Mayor* holds at the same page: '' Whatever has been put upon the land by the owner with the intention that it should remain upon the land and was essential to the use which he made of it, is, generally speaking, as between himself and his vendee, a fixture, and goes with the land when he shall sell it. \* \* \* So machinery which has been put in the building and is permanent in its character, and essential for the purposes for which the building is occupied, is to be regarded as realty. (*O'Brien* v. *Kusterer,* 27 Mich. 289.) ''

Apart however, from the question of whether or not the claimant's burden of proof is supported by such a presumption arising from the fact of ownership, the court finds — contrary to the city's contention — that there is '' other '' evidence that the installation of the machinery in question was of a permanent nature (see *Whitlock Ave.. supra*). The machines were '' a part of the plant, as essential to its operation as the building itself, and \* \* \* could not be removed except with such depreciation in value as would amount to an appropriation of property without just compensation.'' (*Phipps* v. *State of New York, supra,* p. 300; cf. *Matter of City of New York* [*Seward Park Slum Clearance Project*], 10 A D 2d 498; *Jackson* v. *State of New York,* 213 N. Y. 34, *supra*; *United States* v. *Certain Property, etc.,* 306 F. 2d 439.)

But this is not to say that the court accepts claimant's argument that compensation should be computed on the plant as an integrated operation. Claimant has failed to cite any appellate authority for this proposition. If there should be such a rule, it is for a higher court to declare it. This court is constrained to follow what it understands to be the law as found in the aforementioned cases. Under the circumstances of this case, the court therefore is bound to apply the test of unity of the elements of annexation, adaptability and intention of permanence. Applying this test, for example, the claim for the six printing '' heads '' is allowed as hereafter indicated. The claim however, for the 2,300 engraved copper and steel rollers is disallowed because of the failure to meet the most basic prerequisite, viz., annexation.

[Schedules of disputed items found compensable and of items concededly compensable omitted.]

The court finds the replacement value of the afore-mentioned items in Schedules A-1 and A-2 to be $637,725. Further, the court notes that the engineer's fee is normally a percentage com-

puted on that amount less depreciation. Since this fee is subject to the same rate of depreciation as the rate of depreciation for the respective items — which in this case has varied in each instance — the court on the evidence is allowing 8% on the sound value as herein indicated:

| | |
|---|---:|
| Schedule A-1 ..................... | $306,141 |
| Schedule A-2 ..................... | 74,280 |
| | 380,421 |
| plus 8%, Engineer's fee........... | 30,433 |
| Total ............. | $410,854 |

[Schedule of items found not compensable omitted.]